**Shawn Anthony LEDET, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–03–00437–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 10, 2005.

Discretionary Review Refused
Sept. 14, 2005.

Jerome Godinich, Jr., R. Scott Shearer, R. Scott Shearer, Houston, TX, for Appellant.

Carmen Castillo Mitchell, Assistant District Attorney, Charles A. Rosenthal, Jr., District Attorney–Harris County, Houston, TX, for Appellee.

Panel consists of Justices TAFT, KEYES, and HANKS.

## OPINION

EVELYN V. KEYES, Justice.

Appellant, Shawn Anthony Ledet, was convicted by a jury of engaging in organized criminal activity. The jury assessed appellant's punishment at ten years' confinement, suspended for ten years, community supervision, and a fine of $5,895.47. The trial court ordered appellant to serve 180 days in the Harris County Jail and to pay $400,000 in restitution to Texan Ford as a condition of his community supervision. In four issues, appellant contends (1) that the evidence was legally insufficient to support his conviction and (2) that the 180 days incarceration and the restitution order were unconstitutional. We affirm.

## Background

In April 2001, Houston Police Officer Michael Ingels, assigned to the Auto Theft Division, was contacted by a detective from Benbrook Police Department regarding a stolen vehicle that had been placed for auction in Fort Worth. Prompted by the information provided by the Benbrook police, Ingels and his partner, Officer Joe Smith, discovered that Leona Chrichlow had sold the stolen vehicle to a Car Max dealership in Houston.

Ingels and Smith went to the Car Max to review the sales records for the stolen vehicle, as well as completed sales deals and attempted sales deals conducted in the last name of Chrichlow. They discovered that Tamara Chrichlow (Chrichlow), Leona Chrichlow's daughter, had sold two other vehicles with altered vehicle identification numbers (VINs) to Car Max. Ingels and Smith also discovered that Chrichlow was attempting to sell a 2001 Ford Expedition to the Car Max.

Using the information provided by Car Max, Ingels went to Chrichlow's apartment. Chrichlow arrived at the apartment driving the Expedition she had attempted to sell to the Car Max, but she left shortly after she arrived. When she left, a marked Houston Police car pulled her over for a traffic violation. Chrichlow presented proof of insurance, a Florida registration, and her driver's license. Upon looking at the Expedition's VIN, Ingels believed it looked "bogus." Based on this belief, Ingels became suspicious that the vehicle was stolen; he had Chrichlow taken into custody for possession of a stolen vehicle. After Chrichlow's arrest, the Expedition was searched. The search uncovered several pieces of mail from Texan Ford regarding three vehicles other than the Expedition.

Ingels and Smith went to Texan Ford and contacted Hart Oshman, the General Manager. Oshman pulled the sales records for the Expedition and the other three vehicles. Ingels found that all four sales were conducted by the same salesman, appellant. Ingels concluded that all four vehicles were stolen by identity theft. Oshman testified that, once he knew about the fraud relating to the first four vehicles, he pulled the sales records for all of appellant's sales deals.

Ingels discovered that a total of 19 vehicles (including the initial four) were purchased using the names and credit information of people who never took possession of the vehicles. All of the named purchasers had very high credit scores, which Ingels stated was unusual. All but two of the purchasers had out-of-town addresses, which was also unusual. Almost all of the vehicles were sold for the manufacturer's suggested retail price, which was also very rare. Most of the sales deals included extended warranties, which was unusual. All of the sales deals were conducted over a six-week period, and appellant was the salesman on each deal.

In all of the deals, the purchaser never came to the dealership.

Oshman testified that appellant had been a weak salesman until the middle of February 2001, when his gross profits shot up dramatically. Appellant made significant profits on each of the 19 sales deals conducted from the middle of February until he was arrested in April. The gross profits were also unusually high on each of the deals. None of the deals had a trade-in vehicle or money down, which was unusual. Each sale was made off-site, which Oshman explained was very unusual. Oshman testified that the approximate value of the vehicles sold was $700,000–$800,000. He further testified that Texan Ford was still liable for the cost of the vehicles and that the cost to the dealership was approximately $500,000.

Mike Capel, the General Sales Manager at Texan Ford in 2001, testified that each of the sales deals had discrepancies, including problems with the driver's licenses and the insurance card copies. Several copies of the driver's licenses had fingerprints over the faces; and several of the sales deals had the same face on the driver's licenses. Officer Smith testified that multiple sales deals had driver's licenses with the same audit number. The same insurance cards were also used in several deals. In a few of the sales deals, the VINs on the copies of the insurance cards were not legitimate VINs. Oshman testified that, until Ingels and Smith requested the sales documents, no one had noticed the problems. He also testified that the salesman was responsible for obtaining the documents for the sales.

Appellant testified that the purchasers signed the paperwork at the time he delivered the vehicles to them and that he never saw the purchasers again. He stated that a check of each purchaser's credit was run before the paperwork was completed or the vehicle was delivered. Appellant also testified that he received the information necessary to run credit checks by fax. However, no faxed documents were found in any of the sales files.

William Ammons testified that he and Edward Waddell were involved in dealing with stolen and forged checks. Waddell told Ammons that he could help him obtain a vehicle. Waddell arranged for Ammons to meet him at a mall parking lot. Waddell and appellant drove up in a 2000 Lincoln Navigator. Appellant gave Ammons the keys, but never asked him to sign any paperwork or to produce a driver's license or insurance. There was no trade-in, and Ammons made no down payment. Waddell gave Ammons a payment book for the vehicle in the name of Edward Bedell, but with Chrichlow's home address. Ammons made three cash payments directly to Chase Bank, the issuer of the payment book.[1]

John Hinz, a special agent with the Secret Service, testified that he investigated and arrested Demeris Davis for counterfeit securities, specifically checks. Hinz testified that Waddell worked with Davis with regard to counterfeit checks. When Hinz arrested Davis, he too was in possession of one of the 19 vehicles sold by appellant.

Appellant testified that he had met Chrichlow and a man named Henry Harris in the dealership and sold them vehicles, and that subsequently Harris had referred a lot of customers to him. Appellant stated that he met each customer off-site, with

---

1. Smith explained that, in this type of scheme, the people who receive the vehicles are usually instructed to make three to five payments. By making a few payments, the sales deal goes beyond the "period of recourse," meaning that the dealership is no longer required to repurchase the vehicle from the finance company.

the approval of sales managers, and that each showed him identification, a copy of his driver's license, and his insurance. Oshman testified, in rebuttal to appellant's testimony, that he found sales documents and some partially doctored driver's licenses and insurance cards in appellant's desk after appellant was discharged from Texan Ford.

Appellant was indicted for engaging in organized crime in violation of section 71.02 of the Texas Penal Code. The indictment alleged that appellant

> with intent to establish, maintain and participate in a combination and in the profits of a combination, said combination consisting of SHAWN LEDET, EDWARD WADDELL, TAMARA CHRICHLOW, AND DEMERIS DAVIS, [DID] COMMIT AND CONSPIRE TO COMMIT the offense of THEFT, namely in that he did unlawfully pursuant to one scheme and continuing course of conduct, appropriate, by acquiring and otherwise exercising control over property, namely, EIGHTEEN AUTOMOBILES, owned by HART OSHMAN, ... with the intent to deprive [HART OSHMAN] of the property and the total value of the property appropriated was over two hundred thousand dollars.

The jury found appellant guilty, and assessed punishment at 10 years' confinement, suspended for 10 years, and assessed a $5,895.47 fine appellant. The trial court ordered appellant to spend 180 days in county jail and to pay $400,000 in restitution to Texan Ford as conditions of his community supervision.

## Discussion

### Organized Criminal Activity

In his first issue, appellant argues that the evidence was legally insufficient to prove (1) that an illegal "combination" under Penal Code section 71.02 existed and (2) that he committed the predicate offense of theft, as required to prove the offense of engaging in organized criminal activity. *See* Tex. Pen.Code Ann. § 71.02 (Vernon Supp.2004–2005).

### Standard of Review

We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App.2000); *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000). Although our analysis considers all evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the fact finder. *King,* 29 S.W.3d at 562.

### Combination

A person engages in organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, ... he commits or conspires to commit" one of several enumerated offenses, including theft. Tex. Pen.Code Ann. § 71.02(a)(1) (Vernon Supp.2004–2005). The State has the burden of proving the combination. *Hart v. State,* 89 S.W.3d 61, 63 (Tex.Crim.App.2002). A "combination" requires three or more people who collaborate in carrying on criminal activities. Tex. Pen.Code Ann. § 71.01(a) (Vernon 2003). The State must prove that the defendant intended to establish, maintain, participate in, or participate in the profits of a combination and that the members of the combination intended to work together in a continuing course of criminal activity. *Hart,* 89 S.W.3d at 63; *Dowdle v. State,* 11 S.W.3d 233, 236 (Tex.Crim.App.2000). Participants in the combination need not

know each other's identity, and membership in the combination may change. TEX. PEN.CODE ANN. § 71.01(a)(1)-(2). However, there must be evidence of an agreement to act together in this continuing course of activity. *Barber v. State*, 764 S.W.2d 232, 235 (Tex.Crim.App.1988). Direct evidence of intent is not required; circumstantial evidence may be used. *See Hart*, 89 S.W.3d at 64.

> A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims. A jury may also infer knowledge from such evidence.

*Manrique v. State*, 994 S.W.2d 640, 649 (Tex.Crim.App.1999).[2]

■ Viewed in the light most favorable to the jury's verdict, the evidence shows that appellant sold 19 vehicles under unusual circumstances, including the vehicles driven by Chrichlow and Davis when they were arrested. Appellant sold each of the vehicles for the manufacturer's suggested retail price and with an extended warranty. The identities used to purchase the 19 vehicles had high credit scores and out-of-town addresses. None of the purchasers of the 19 vehicles came into the dealership. Each of the sales deals had discrepancies in the sales paperwork, specifically in the insurance cards and the driver's licences photographs and audit numbers. Although appellant stated that each of the 19 buyers faxed their information to him so he could run a credit check, no such faxes

were found; however, doctored documents, such as those used to obtain the vehicles from Texan Ford, were found in appellant's desk after he was terminated. None of the persons identified as purchasers took possession of the vehicles; rather, each sale was obtained by identity theft. Appellant's profits and Texan Ford's gross profits shot up dramatically from the sales of the 19 vehicles.

The evidence shows that Chrichlow visited appellant at the dealership several times a week and was arrested while in possession of one of the 19 vehicles. The search subsequent to her arrest led to the discovery of mail relating to three of the 19 vehicles sold by appellant. Chrichlow's address was used on several payment books for the false deals, including the payment book found in Ammons's vehicle. The evidence further shows that Waddell arranged for Ammons to receive one of the 19 vehicles and that Waddell and appellant delivered a Lincoln Navigator to Ammons. Appellant did not have Ammons sign any paperwork; nor did he obtain any identification information from Ammons. Finally, when Davis was arrested for counterfeiting checks in a scheme with Waddell, Davis was in possession of one of the 19 vehicles.

Viewed in the light most favorable to the verdict, the evidence was legally sufficient for a rational juror to conclude that appellant intended to and did participate in a combination that collaborated in carrying on criminal activities through the appropriation of automobiles from Texan Ford.

---

**2.** The jury charge included an instruction on the law of parties. A person is "criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." TEX. PEN.CODE ANN. § 7.01(a) (Vernon 2003). A person is criminally responsible for an offense committed by another if, "acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* at § 7.02(a)(2) (Vernon 2003). "Each party to an offense may be charged with the commission of the offense." *Id.* at § 7.01(b).

*Theft*

■ To prove the offense of engaging in organized criminal activity as a party, the State must also prove that the defendant had the mental state required for commission of the underlying offense. *Hart,* 89 S.W.3d at 63. Here, the underlying offense charged was theft. Theft is committed when a person "unlawfully appropriates property with the intent to deprive the owner of the property." TEX. PEN. CODE ANN. § 31.03(a) (Vernon Supp.2004–2005).

■ The evidence shows that appellant actively participated in a combination to appropriate over $500,000 worth of property from Texan Ford, namely 19 vehicles.[3] All vehicles were purchased through identity theft. Each of the sales documents, which appellant was required to gather, had discrepancies, including the use of the same photograph on multiple licenses, multiple licenses with the same audit numbers, and several insurance cards with false VINs. Similarly doctored documents were found in appellant's desk after he was discharged. The named purchasers had unusually high credit scores and out-of-town addresses. No down payments were made, and no vehicle was used as a trade-in. Appellant delivered each of the vehicles off-site. We conclude that, viewed in the light most favorable to the verdict, the evidence was legally sufficient for a rational juror to conclude that appellant intended to deprive Texan Ford of property as alleged in the indictment.

We overrule appellant's first issue.

*Conditions of Community Supervision*

The jury assessed appellant's punishment at ten years' confinement and recommended that he be given community supervision for ten years. The jury also imposed a $5,895.47 fine. The trial court ordered appellant to serve 180 days' confinement in the Harris County Jail and to pay $400,000 in restitution to Texan Ford, as conditions of his community supervision.

In his second issue, appellant contends that the 180 days' confinement the trial judge imposed as a condition of his community supervision is a violation of his Sixth Amendment right to trial by jury. Appellant argues that the recent United States Supreme Court decision in *Blakely v. Washington* prohibits trial judges from adding a time of incarceration to a jury's assessed punishment of probation. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). In his third and fourth issues, appellant contends the $400,000 restitution order imposed by the trial judge is unconstitutional because (1) it violates his Sixth Amendment right to trial by jury and (2) it violates his right to due process. Specifically, in his third issue, appellant argues that *Blakely* prohibits trial judges from adding a restitution order to a jury's assessed punishment of probation. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). In his fourth issue, appellant contends the restitution order violates his right to due process because the trial court did not orally add the restitution order at the sentencing hearing and there was no factual basis for the amount of the restitution.

---

3. The indictment charged appellant with the theft of 18 vehicles. Theft of property valued at more than $200,000 is a first degree felony. TEX. PEN.CODE ANN. § 31.03. "When amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." TEX. PEN.CODE ANN. § 31.09 (Vernon 2003).

Article 42.12 of the Code of Criminal Procedure governs the imposition and terms of community supervision. TEX. CODE CRIM. PROC. ANN. art. 42.12 (Vernon Supp.2004–2005).

> "Community supervision" means the placement of a defendant by a court under a continuum of programs and sanctions, with conditions imposed by the court for a specified period during which ... a sentence of imprisonment or confinement, imprisonment and fine, or confinement and fine, is probated and the imposition of sentence is suspended in whole or in part.

*Id.* art. 42.12 § 2(2)(B). The judge must determine the conditions of community supervision, and may alter or modify the conditions at any time. *Id.* art. 42.12 § 11(a). "The judge may impose any reasonable condition that is designed to protect or restore the community, protect or restore the victim, or punish, rehabilitate, or reform the defendant." *Id.* The conditions of community supervision may include a number of requirements, including submitting a defendant in a felony case to a term of confinement for no longer than 180 days in county jail. *Id.* art. 42.12 § 12(a). If a defendant is placed on community supervision, the payment of restitution is also a condition of the community supervision. TEX.CODE CRIM. PROC. ANN. art. 42.037(h) (Vernon Supp.2004–2005).[4]

Generally, a defendant must make a timely and specific objection at trial to preserve his complaint on appeal. TEX.R.APP. P. 33.1(a). A defendant's failure to object to the conditions of community supervision at trial affirmatively accepts the terms. *Speth v. State,* 6 S.W.3d 530, 534–35 (Tex.Crim.App.1999). Appellant did not object to the conditions of community supervision at the punishment hearing; nor did he file a motion for new trial. Appellant first complained of the conditions of community supervision on direct appeal. Furthermore, appellant signed a copy of the conditions of community supervision stating that he understood the terms and the consequences for failing to comply. The document specifically included a provision confining him to the Harris County Jail for 180 days. The condition of supervision document signed by appellant also included the $400,000 restitution order.

We hold that appellant did not preserve his complaints for appellate review regarding the 180 days' confinement or the restitution order. *See* TEX.R.APP. P. 33.1(a); *Speth,* 6 S.W.3d at 534–35. His second, third, and fourth issues were waived.

We overrule appellant's second, third, and fourth issues.

### CONCLUSION

We affirm the judgment of the trial court.

---

4. Article 42.037 of the Code of Criminal Procedure governs the imposition of restitution. TEX.CODE CRIM. PROC. ANN. art. 42.037 (Vernon Supp.2004–2005). In addition to any fine imposed, the trial court that sentences a convicted defendant may order the defendant to make restitution to the victims of his offense. *Id.* art. 42.037(a). While the trial court has broad discretion when determining restitution, due process requires three limits on the restitution order. *Cantrell v. State,* 75 S.W.3d 503, 512 (Tex.App.-Texarkana 2002, pet. ref'd). First, the restitution amount must be just and supported by a factual basis in the record. *Campbell v. State,* 5 S.W.3d 693, 696–97 (Tex.Crim.App.1999). Second, restitution is limited to the offense for which the defendant is criminally responsible. *Id.* Third, restitution is only proper for the victims of the crime for which the defendant was charged, convicted, and sentenced. *Id.*