Opinion issued May 27, 2010

                                                                        

 

 

 

 

 



 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-08-00335-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



KENNETH GARRETT BEATTY, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause No. 1122696

 

 



MEMORANDUM OPINION

          A
jury convicted Kenneth Garrett Beatty of theft of property valued, in the
aggregate, between $20,000 and $100,000, assessed punishment at ten years’
confinement and a $10,000 fine, and recommended community supervision.  See
Tex. Penal Code Ann. § 31.03(e)(5)
(Vernon Supp. 2009).  As a condition of
Beatty’s community supervision, the trial court required Beatty to serve 180
days in the Harris County jail.  On
appeal, Beatty contends that:  (1)
article 42.12, section 12 of the Code of Criminal Procedure, which allows a
trial judge to impose a 180 day confinement period as a condition of community
supervision, violates Apprendi v. New
Jersey and Blakely v. Washington;
(2) the trial court erred by including an instruction on conspiracy in the
written charge because the State presented no evidence that Beatty agreed with
another person to commit theft; and (3) the trial court erred by denying
Beatty’s motion for instructed verdict because the State presented no evidence
that Beatty committed theft.  We hold
that (1) the State presented legally sufficient evidence that Beatty committed
theft; (2) the trial court appropriately included an instruction on
conspiracy in the charge because the State presented some evidence that Beatty
entered into an agreement to commit theft; and (3) Beatty waived his challenge
to the terms of his community supervision because he did not object at the time
the trial court imposed the conditions. 
We therefore affirm.

Background

In early 2000, Kenneth Beatty became
the executive director of the Sickle Cell Association of the Texas Gulf Coast
(“SCA”), a small charity which, among other functions, raises funds to educate
members of the public and to help prevent and treat sickle cell disease.  Formerly employed at the United Way, Beatty
in turn hired Carlean Cruse, who had formerly worked for him at the United Way,
as financial secretary, to replace the existing financial secretary, who he
fired.  SCA is an affiliate of the United
Way, and former SCA board members testified that the United Way provides
approximately fifty to sixty percent of SCA’s annual budget of $600,000, with
the remainder of the budget coming from various fund-raising events such as an
annual gala, golf tournament, and fashion show. 
SCA had an accountant, Selwyn Blanchard, and the United Way required SCA
to undergo an annual financial audit.  At
the SCA board meetings, board members received financial reports, usually a
spreadsheet describing income and expenses, prepared by an SCA employee.  According to former SCA board president Dr.
John Codwell, before Beatty’s tenure as executive director, board members would
co-sign large checks; however, after Beatty took over the position, either
Beatty or Cruse signed all checks, with no signatures by the board
members.  Blanchard testified that,
before Beatty, SCA employees always kept backup data for unusual expenditures
and he received the original bank statements and copies of cancelled checks for
his monthly reports.  After Beatty became
executive director, Blanchard merely received copies of bank statements and
check stubs, pre-coded by Cruse to indicate the purpose for the
expenditure.  Codwell and former board
member Rhondal Jenkins testified that, in late 2003, the board began to discuss
financial problems of the agency, including concerns that bills were not being
paid.

The board considered the 2004 gala,
which netted around $100,000, to be a success; however, shortly after the gala,
Beatty informed the board that SCA was having financial problems, which
jeopardized payroll and the ability to finance the annual summer camp program
for children with sickle cell disease. 
Codwell, Jenkins, and former board members Tamla Wilson and Anthony West
all testified that, at this point, they began requesting more detailed
financial reports and asked to see the actual financial records and not merely
summaries prepared by SCA employees.  For
a period of several months, board members requested financial documents, but
Beatty never provided any documents, even though he promised on at least two
occasions that he would bring the documents with him to meetings.  The board scheduled its annual retreat and
strategic planning session for Saturday, November 13, 2004.  On Friday, Beatty, who promised to bring
SCA’s financial records to the retreat, faxed his resignation letter to
Codwell.  Cruse testified that she gathered
the relevant financial records and left them in a box on her desk on Thursday,
but when she arrived for the retreat on Saturday morning, the box had
disappeared.  Codwell and West testified
that they both searched the SCA office and could not find any bank records,
board minutes, or any kind of financial records for 2000 through 2004.

Jennifer Browning took over the
position of executive director in February 2005 and she could not find any
organized financial records.  She
testified that, almost immediately, she began receiving phone calls from bill
collectors regarding past due bills and large delinquencies on credit cards
issued to SCA.  According to Browning,
she also could not find any credit card records or board minutes at the SCA
office.

David Pilant, a fraud examiner with
the Harris County District Attorney’s Office, testified on behalf of the State
regarding SCA’s financial records.  During
Beatty’s tenure as executive director, SCA issued almost $182,000 in
“over-payroll” checks, checks written outside the official payroll system, to
Beatty, Cruse, and the other employees.  Beatty
personally received $18,063.18 from over-payroll checks.  According to Pilant, no reimbursement records
existed, and he was therefore unable to determine the percentage of
over-payroll checks that were actually written for the appropriate purpose of
reimbursement for personal funds spent on SCA-related matters.  Further, although most checks did not indicate
their purpose, Pilant found that, for the checks that did have an indication,
that indication “did not necessarily relate to how the check was actually used.”  For example, Pilant traced a check payable to
petty cash directly into an employee’s bank account.

Pilant also testified that four
employees, Beatty, Cruse, Adrian LeBlanc, and Carolyn Hayes, all possessed
credit cards issued to SCA, and these four employees charged over $186,000 on
these credit cards.  Beatty, in
particular, charged approximately $124,000. 
Based on his review of the credit card records, Pilant determined that
SCA actually paid $89,877 of Beatty’s credit card charges.  Pilant stated that another source paid $5600
to the credit card company on Beatty’s card.  Additionally, SCA’s bank records demonstrated
that Beatty deposited $4000 into SCA’s account, although Pilant could not
identify the purpose of this payment.  Pilant
estimated that, after considering the over-payroll checks issued to Beatty, his
charges on the SCA credit cards, and the amount Beatty paid to SCA, Beatty’s
net gain from these transactions was $134,982.

Codwell and Jenkins were unaware that
Beatty procured credit cards in SCA’s name for the staff, and that they had used
these cards for personal expenses, until Browning started receiving the bills
for these cards.  Codwell stated that
Beatty did not have board permission to use agency credit cards for personal
use, and Beatty never sought permission from the board.  Codwell was also unaware that Beatty and
Cruse wrote checks to themselves and the other employees for amounts over their
regular paychecks.  Beatty never
discussed these expenditures with the board either, and the employees did not
have permission to receive over-payroll checks, although, with proper
documentation, they could be reimbursed if they used personal funds for small
SCA-related expenses.  Wilson and West
both testified that they were unaware that SCA had any credit card accounts and
Beatty never discussed employees using the credit cards with the board,
especially not for personal expenses.

Beatty testified on his own behalf
and admitted that he used SCA credit cards to make personal expenses.  At first, Beatty admitted making $52,055.61
worth of personal charges on SCA’s credit cards, though he later revised that
estimate to $37,130.16, which he felt was a “more accurate reflection” of his
personal charges.  Beatty also claimed
that he was a personal guarantor on the credit cards, was currently negotiating
with the credit card companies and SCA to determine his balance and “work
something out” regarding payment, and he always had the expectation that he
would be responsible for the amount of his personal charges.  When asked by the prosecutor why he had not
made any payments on the credit cards, even though the last charge was more
than three years before trial, Beatty stated that he was waiting to confirm his
balance in the civil lawsuit with SCA. 
Beatty also admitted that the board knew of at least one credit card,
but he never informed the board of any additional credit cards, or that he
allowed the employees to use SCA credit cards to make personal purchases.

Beatty also admitted that he signed a
letter to Whitney Bank, asking for credit cards for Cruse and LeBlanc and
stating that the board approved adding Cruse and LeBlanc as staff members
eligible for credit cards, even though the board minutes did not reflect that
the board ever approved these cards.  Beatty
also stated that employees could receive emergency loans or salary advances, in
the form of an over-payroll check, and employees had to properly document the
request and take a deduction from their paycheck.  The over-payroll checks issued to Beatty, for
example, were for “legitimate expenses or monies owed to him.”  Beatty did not authorize any over-payroll
checks that were not owed to or earned by the employee, and, to his knowledge,
proper documentation existed for these payments.  Beatty denied committing theft and testified
that, at the time he made the personal charges, he intended to reimburse SCA.

Carlean Cruse testified that, as a
result of her conduct while she was financial secretary of SCA, she pleaded
guilty to first degree felony theft and owed SCA $78,681.21 in
restitution.  Cruse regularly used an SCA
credit card for personal expenses, including casino trips to Louisiana,
clothing stores, and bills.  Cruse stated
that Beatty informed the staff that they could use their SCA credit cards for
personal charges, but they needed to reimburse SCA for these expenses.  Cruse attended board meetings, and never
heard the board and Beatty discuss the additional credit cards and the
over-payroll checks.  Although she paid
SCA’s bills, and had authorization to sign Beatty’s name on checks, Beatty
decided how much to pay on each SCA credit card in a given month.

Cruse further testified that Beatty
instructed her to miscode financial information given to SCA accountant
Blanchard to keep him from ascertaining the purpose of the over-payroll checks
and the use of SCA credit cards for personal expenses.  At Beatty’s direction, Cruse falsified a
report to the board to make it appear as though SCA received a $5000 to $10,000
grant, when they had not received such funding. 
Beatty also instructed Cruse to falsify information in the board minutes
given to SCA auditors Grant Thornton and the United Way to remove negative
information about Beatty.  Cruse
acknowledged that, at Beatty’s request, she misrepresented SCA’s financial
condition to the board.  Cruse also
stated that she wrote checks payable to petty cash or reimbursements, even
though she knew the checks were intended for other purposes, and she discussed
almost every check she wrote with Beatty.

At the close of the State’s case in
chief, Beatty moved for an instructed verdict, contending that:  (1) although the indictment alleged that
Beatty stole a vehicle from SCA, the State presented no evidence of this theft;
(2) the State failed to prove which transactions were impermissible, and
therefore failed to prove that Beatty acted with intent to deprive SCA of its
property; (3) the State failed to prove that Beatty acted pursuant to a scheme
or course of conduct; (4) the State failed to prove that Beatty made an
agreement with another person to commit theft; and (5) the State failed to
prove the aggregate nature of the offense, and thus limitations barred consideration
of any actions taken by Beatty from 2000 to the early part of 2002.  The trial court denied this motion.  At the close of the evidence, Beatty re-urged
his instructed verdict motion, contending that, because he established that
some credit card charges and over-payroll checks were legitimate, the State failed
to prove that Beatty stole over $100,000 from SCA, which is the minimum
aggregate amount for second degree theft. 
Defense counsel also stated:

I guess because Mr. Beatty stood up and admitted in
one document, I think, about $50,000, another document around $30,000 in credit
card charges, I guess the argument could be made at this point in time that
there might be some evidence to go to this jury on a third degree felony
offense.

 

The trial court again denied Beatty’s
motion.  Beatty also objected to the
inclusion of an instruction on conspiracy in the written charge, arguing that
the State had produced no evidence that Beatty agreed with another person to
commit theft.  The trial court overruled
this objection and included the instruction in the charge.

The jury assessed punishment at ten years’
confinement and a $10,000 fine, and recommended that the trial judge place
Beatty on community supervision and probate the fine.  The trial court adopted the jury’s
recommendation, probated the fine, and placed Beatty on community supervision
for ten years.  On March 25, 2008, Beatty
and the trial court both signed the conditions of community supervision, one of
which required Beatty to serve 180 days in the Harris County Jail.  Beatty did not object at the time the trial
court imposed the conditions and he agreed to them.  On April 23, within the time period for
filing a motion for new trial, Beatty filed a written objection to this
condition, contending that article 42.12, section 12 of the Code of Criminal
Procedure, which authorizes a trial court to require up to 180 days’
confinement as a condition of community supervision, violates Apprendi v. New Jersey and Blakely v. Washington, because it
impermissibly allows a trial court to increase a defendant’s sentence beyond
the jury’s punishment finding.  The trial
court overruled this motion.

Discussion

Sufficiency of Evidence of Theft

          Beatty
contends that the trial court erred by denying his motion for an instructed
verdict because the State failed to prove which of Beatty’s actions were illegal
and presented no evidence that Beatty stole “cash money” belonging to SCA.  We treat an issue challenging the trial
court’s denial of an instructed verdict as a challenge to the legal sufficiency
of the evidence.  Williams v. State, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).  In a legal sufficiency review, we view the
evidence in the light most favorable to the verdict to determine whether any
rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt.  Salinas v. State, 163 S.W.3d 734, 737
(Tex. Crim. App. 2005).  The fact-finder
is the sole judge of the weight and credibility of the evidence.  Margraves
v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000), overruled on other grounds by Laster v. State, 275 S.W.3d 512 (Tex.
Crim. App. 2009).  The fact-finder may
choose to believe a witness even if contradictory evidence is introduced, and
may believe some or all of a witness’s testimony.  See
Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).  We may not reevaluate the weight and
credibility of the evidence and substitute our judgment for that of the
fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).  We resolve any inconsistencies in the
evidence in favor of the verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex.
Crim. App. 2000).

          The
grand jury indicted Beatty for first degree felony theft, and the written
charge contained lesser-included offense instructions for second degree, third
degree, and state jail felony theft of property.  The jury convicted Beatty of third degree
felony theft of property.  A person
commits the offense of third degree felony theft of property if, with the
intent to deprive the owner of property, he unlawfully appropriates property
with an aggregate value between $20,000 and $100,000.  See
Tex. Penal Code Ann.
§§ 31.03(a), (e)(5) (Vernon Supp. 2009); see also id. § 31.09 (Vernon 2003) (allowing aggregation of
amounts when obtained pursuant to “one scheme or continuing course of
conduct”).  The Penal Code defines “deprive”
as “withhold[ing] property from the owner permanently or for so extended a
period of time that a major portion of the value or enjoyment of the property
is lost to the owner” or “dispos[ing] of property in a manner that makes
recovery of the property by the owner unlikely.”  Id.
§§ 31.01(2)(A), (C) (Vernon Supp. 2009). 
Appropriation of property is unlawful if it is done “without the owner’s
effective consent.”  Id. § 31.03(b)(1); see
also id. § 31.01(3) (defining “effective consent”).  The State is not required to present evidence
that the defendant stole every piece of property alleged in the indictment, as
long as the State presents sufficient evidence to satisfy the aggregate’s
minimum value.  See Dickens v. State, 981 S.W.2d 186, 188 n.4 (Tex. Crim. App.
1998) (“[T]he State need not prove each constituent theft as long as it
demonstrates that enough of the property described in the indictment was stolen
to satisfy the aggregated value allegation.”); Lehman v. State, 792 S.W.2d 82, 83–88 (Tex. Crim. App. 1990).

          Beatty
specifically contends that the State did not prove that Beatty stole property
from SCA because:  (1) the State failed
to prove which over-payroll checks and credit card charges were impermissible;
(2) some SCA board members testified that the Beatty did not need the Board’s
approval to write over-payroll checks or checks for reimbursement; and (3)
Beatty’s credit card charges were not “money,” as alleged in the
indictment.  Beatty points to testimony from
three board members, Jenkins, West, and Wilson, which indicated that Beatty did
not need board approval to issue reimbursement checks and that some of the
credit card charges and checks were for legitimate business purposes.  In determining whether the trial court
properly denied Beatty’s instructed verdict motion, our focus is not on whether
the evidence indicates that Beatty had permission to write over-payroll checks
and use SCA credit cards for personal purposes. 
Rather, we review the evidence to determine whether the State produced
some evidence from which a rational jury could determine beyond a reasonable
doubt that Beatty unlawfully appropriated between $20,000 and $100,000 worth of
SCA’s property, with the intent to permanently deprive SCA of that
property.  See Williams, 937 S.W.2d at 482; Salinas, 163 S.W.3d at 737; Tex.
Penal Code Ann. §§ 31.03(a), (e)(5).  According to Codwell, Jenkins and Wilson, the
board never discussed the additional credit cards or over-payroll checks at any
meetings, and Beatty and the employees did not have board permission to use SCA
credit cards for personal use or to issue over-payroll checks.

          The
trial court admitted the credit card records for SCA, which indicated
approximately $186,000 in charges from 2000 to 2004.  The charges included expenditures at clothing
stores, restaurants, and trips to Mexico, where SCA had no offices,
conferences, or clients.  Codwell
conceded that the credit card records could include some legitimate SCA-related
expenses, but based on his review of the records, the majority of the charges
“could not have been legitimate expense[s]” for SCA.  When defense counsel asked Wilson if the
records included legitimate SCA expenses, she stated that she was surprised SCA
even had credit cards, as credit cards were never discussed during board
meetings, so “it would be very hard for [her] to say that [the charges] were
Sickle Cell related charges.”  According
to Wilson, for the charges to be legitimate, Beatty or Cruse would have to
present the charges to the board for approval, which never happened.  Similarly, Wilson testified that any
over-payroll checks were “not appropriate in that they were not approved by the
board,” although she acknowledged that small business-related reimbursements would
not need board approval if the employee submitted proper documentation.

          Beatty
testified on his own behalf and acknowledged that he used SCA credit cards for
personal purchases.  According to Beatty,
he was the personal guarantor on the credit cards and was, at the time of
trial, in contact with the credit card companies regarding the outstanding
balance.  Beatty acknowledged that he
should have reimbursed SCA, and he submitted a summary of personal charges for
which he felt responsible.  This summary
reflected that Beatty charged $52,055.61 in personal expenses on SCA’s credit
cards.  Beatty later offered a revised
summary, which he felt “more accurately reflect[ed]” his personal charges.  According to this second summary, Beatty
admitted charging $37,130.16 in personal expenses on SCA’s credit cards.  He admitted that the board minutes did not
include any discussions of the additional credit cards and over-payroll
checks.  Beatty also admitted writing a
letter to Whitney Bank, stating that the board approved adding Cruse and
LeBlanc as staff eligible for credit card accounts, even though the board
minutes did not reflect that such approval took place and Beatty did not recall
ever discussing credit cards with the board.

          Beatty
contends that, because he was a personal guarantor on the credit cards, the
debt he incurred was not theft of SCA’s property.  We have previously held that “[t]heft
convictions resulting from otherwise contractual civil disputes may warrant
reversal for insufficient evidence where there is no evidence supporting the requisite
criminal intent.”  Ellis v. State, 877 S.W.2d 380, 383 (Tex. App.—Houston [1st Dist.]
1994, pet. ref’d) (citing Peterson v.
State, 645 S.W.2d 807, 811 (Tex. Crim. App. 1983)).  We noted that criminal intent may be inferred
from the surrounding circumstances, and in Ellis,
which involved payments made to Ellis so he could assist individuals with
credit problems in finding vehicles, a rational jury “could have found that
[Ellis] had no intention of fulfilling his contractual obligations, since he
never did so, and that his promises to the complainants were merely a ruse to
accomplish theft by deception.”  Id. 
Similarly, here, although Beatty testified that he was personal
guarantor on the credit cards and he knew that he was ultimately responsible for
his personal charges, the State presented evidence that Beatty charged a large
amount of personal expenses on SCA’s credit cards and did not pay his balance.  Beatty continually failed to produce financial
records, including credit card records, and when requested by the board to do
so, the records disappeared.  Moreover, he
instructed Cruse to falsify financial information given to SCA accountant Blanchard
so he would not know that Beatty and the other employees were using the SCA
credit cards for personal charges.  Based
upon this evidence, a jury reasonably could conclude that Beatty had no
intention of “fulfilling his contractual obligation” by paying the credit card
companies or reimbursing SCA for his personal charges.  See id.

          Beatty
additionally contends that the purchases made with SCA’s credit cards and the
debt he incurred were not “money” as the State alleged in the indictment.  According to Beatty, because of this variance,
the State did not prove that Beatty stole “cash money” belonging to SCA.  The indictment alleged that:

KENNETH GARRETT BEATTY . . . on or about VARIOUS DATES BETWEEN JANUARY 4, 2000 AND
DECEMBER 31, 2004, did then and there unlawfully, pursuant to one scheme
and continuing course of conduct acquire and otherwise exercise control over
property other than real property, namely money and/or one automobile, of an
aggregate amount and value of two hundred thousand dollars or more, which
property was owned by the Sickle Cell Association of the Texas Gulf
Coast . . . .

 

A “variance” occurs when there is a
discrepancy between the allegations in the indictment and the evidence offered
at trial.  Gollihar v. State, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001).  We treat variance claims as insufficiency of
evidence problems.  Id. at 247.  Only a material
variance renders the evidence insufficient. 
Id. at 257.

We have held that no variance exists
between an indictment “alleging conversion of cash and proof showing conversion
of a check.”  Mueshler v. State, 178 S.W.3d 151, 154 (Tex. App.—Houston [1st
Dist.] 2005, pet. ref’d); Grogen v. State,
745 S.W.2d 450, 450–51 (Tex. App.—Houston [1st Dist.] 1988, no pet.).  We relied on the Court of Criminal Appeals’
decision in Kirkpatrick v. State,
which held that no variance existed when the indictment alleged conversion of
cash and the evidence at trial showed conversion of checks because “money was
obtained by a false pretext, through the instrumentality of the check.”  515 S.W.2d 289, 293 (Tex. Crim. App. 1974)
(quoting Rick v. State, 207 S.W.2d
629, 630 (Tex. Crim. App. 1947)).  Here,
Beatty made, by his own admission, between $37,000 and $53,000 worth of
personal charges on SCA’s credit cards.  Pilant
testified that, out of the $124,000 in charges made to SCA credit cards by
Beatty, SCA paid approximately $89,000.  Although
these transactions did not involve cash money, Beatty’s use of SCA’s credit
cards amounts to an instrumentality to misappropriate SCA funds to pay for his
personal expenses.  We follow Mueshler, and hold that no variance
exists between the indictment—which alleged that Beatty stole “money”—and the
proof at trial—which demonstrated that Beatty’s use of SCA’s credit cards for
personal expenses deprived SCA of its cash money.

          When
viewing the evidence in the light most favorable to the verdict, we hold that a
rational jury could have found beyond a reasonable doubt that Beatty unlawfully
appropriated between $20,000 and $100,000 of SCA’s property with the intent to
deprive SCA of that property.  Thus, the
evidence is legally sufficient to support Beatty’s conviction, and the trial
court correctly denied Beatty’s instructed verdict motion.

Charge Instruction on Conspiracy

          Beatty
next contends that the trial court erred by overruling his objection to the
inclusion of a conspiracy instruction in the written charge because the State
presented no evidence that Beatty made an agreement with anyone else to commit
theft from SCA.  When we review a jury
charge, we must first determine whether error exists, and if so, we must
determine whether the error is harmful.  See Ngo v. State, 175 S.W.3d 738, 743
(Tex. Crim. App. 2005).  If, as here, the
defendant properly objects to the charge, we will reverse the conviction if the
error constitutes “some harm.”  See Almanza v. State, 686 S.W.2d 157,
171 (Tex. Crim. App. 1985).  The Code of
Criminal Procedure requires the trial court to deliver to the jury a written
charge “distinctly setting forth the law applicable to the case.”  Tex.
Code Crim. Proc. Ann. art. 36.14 (Vernon 2007); Gray v. State, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004) (“Relying
on [article 36.14], we have held that a trial court is required to fully
instruct the jury on the law applicable to the
case . . . .”); see
also Trevino v. State, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003) (“We have
stated that a jury charge pursuant to Section 8.04, like the one pursuant to
Section 20.04, should be given if it is raised by the evidence, indicating that
‘some’ evidence is sufficient.”). 
Therefore, in determining whether the trial court erroneously included
the conspiracy instruction, we examine the record to determine if the State
produced some evidence of each element of conspiracy.

          A
person commits criminal conspiracy if, with the intent that a felony be
committed, the person (1) agrees with one or more persons that they or one or
more of them engage in conduct that would constitute the offense; and (2) one
or more of them performs an overt act in pursuance of the agreement.  Tex.
Penal Code Ann. § 15.02(a) (Vernon 2003).  An agreement that constitutes a conspiracy
may be inferred from the parties’ acts.  Id. § 15.02(b); see Rhoten v. State, 299 S.W.3d 349, 351
(Tex. App.—Texarkana 2009, no pet.) (“Since direct evidence of intent is rarely
available, the existence of a conspiracy can be proven through circumstantial
evidence.”); Williams v. State, 82
S.W.3d 557, 564–65 (Tex. App.—San Antonio 2002, pet. ref’d) (“Conspiracy is
seldom shown by direct evidence but often must be proved by circumstances from
which the existence of the conspiracy is logically deducible.”).

          Carlean
Cruse testified that, as a result of her conduct while at SCA, she pleaded
guilty to theft and owed SCA over $78,000 in restitution.  Cruse stated that Beatty instructed her to intentionally
miscode financial information sent to SCA accountant Blanchard to conceal the personal
use of company credit cards.  Cruse wrote
every check at Beatty’s direction and discussed almost every check with him,
including checks payable to petty cash or for reimbursements, even though she knew
that these checks were written for other purposes.  Beatty also instructed Cruse to falsify
information given to SCA’s board by changing financial documents to show that
the organization received a grant when it had not.  At Beatty’s direction, Cruse also falsified
board minutes given to the United Way and to SCA auditors Grant Thornton to
remove references to negative information about Beatty.  Former board president Codwell testified
that, after Beatty resigned, he obtained audit records from Grant Thornton
which included copies of board minutes from a meeting that never occurred.  Codwell also discovered that portions of board
minutes that called Beatty’s conduct into question had been deleted from the
minutes provided to Grant Thornton.  Cruse
acknowledged that by the end of 2004, board members routinely received altered
financial information at board meetings and she misrepresented SCA’s financial
condition to the board on “more than one occasion.”

          Beatty,
Cruse, LeBlanc, and Hayes charged over $186,000 on their SCA credit cards, and
SCA paid approximately $130,000 of these charges.  Beatty and Cruse also issued approximately
$182,000 in “over-payroll” checks to various employees, including
themselves.  Cruse testified that Beatty
“directed” every check that she wrote, and he made the decision regarding how
much to pay on each of SCA’s credit cards each month.  Codwell and other board members testified
that they were unaware of the additional credit cards and the over-payroll
checks, and they did not authorize the additional cards, their use for personal
expenses, or the over-payroll checks. 
Cruse stated that she regularly attended board meetings and she never
mentioned, nor heard Beatty mention, the multiple credit cards given to the
employees.

          We
conclude that the State produced some evidence from which the jury could
reasonably infer that Beatty and Cruse agreed to commit theft from SCA and
committed overt acts in furtherance of that agreement.  We therefore hold that the trial court did
not err by instructing the jury on conspiracy.

Objection to Condition of Community Supervision

          Beatty
further contends that article 42.12, section 12 of the Code of Criminal
Procedure, which authorizes the trial court to impose 180 days’ confinement as
a condition of community supervision, allows the trial court to increase his
sentence beyond the statutory maximum in violation of the Sixth Amendment.  See
Apprendi v. New Jersey, 530 U.S. 466,
490, 120 S. Ct. 2348, 2362–63 (2000); Blakely
v. Washington, 542 U.S. 296, 305, 124 S. Ct. 2531, 2538 (2004).  The Code of Criminal Procedure defines
“community supervision” as involving a suspension of the sentence.  Tex.
Code Crim. Proc. Ann. art. 42.12, § 2(2) (Vernon Supp. 2009).  Community supervision is an arrangement in
lieu of the sentence—it is not part of the sentence.  Speth
v. State, 6 S.W.3d 530, 532 (Tex. Crim. App. 1999).  A trial court’s decision to grant community
supervision is “wholly discretionary” and the trial court also has broad
discretion to determine the conditions of community supervision.  Id.
at 533.  In Speth, the Court of Criminal Appeals stated that “[a]n award of
community supervision is not a right, but a contractual privilege, and
conditions thereof are terms of the contract entered into between the trial
court and the defendant.”  Id. at 534.  If the defendant does not object to the
community supervision conditions, those conditions are “affirmatively accepted
as terms of the contract” and the defendant waives “any rights encroached upon
by the terms of the contract.”  Id. 
Thus, “[a] defendant who benefits from the contractual privilege of
probation . . . must complain at trial to conditions he
finds objectionable.”  Id.

          We
have previously held that a defendant who first complains on appeal that a community
supervision condition of 180 days’ confinement violates Apprendi does not preserve the complaint for appellate review.  See
Ledet v. State, 177 S.W.3d 213, 221 (Tex. App.—Houston [1st Dist.] 2005,
pet. ref’d); see also Ivey v. State,
16 S.W.3d 75, 76 (Tex. App.—Houston [1st Dist.] 2000, no pet.).  The Fort Worth Court of Appeals noted that,
under Speth, we cannot hear a
challenge to the validity of a community supervision condition unless the
defendant objected to that condition at the time the trial court imposed the
condition, presumably at sentencing.  Lopez v. State, 46 S.W.3d 476, 480 (Tex.
App.—Fort Worth 2001, pet. ref’d). The
Court of Criminal Appeals recognized an exception to this general rule of
preservation when the defendant does not have the opportunity to object to the
community supervision condition at the time the trial court imposes the
condition.  Rickels v. State, 108 S.W.3d 900, 902 (Tex. Crim. App. 2003).  In Rickels,
the trial court modified a probation condition without a hearing and Rickels
had no opportunity to object to this modification in the trial court.  Id.  In this circumstance, the Court of Criminal
Appeals addressed the merits of Rickels’s appeal, even though he raised the
issue for the first time on appeal.  Id.; see
also Pearson v. State, 994 S.W.2d 176, 179 (Tex. Crim. App. 1999) (stating
that when defendant does not have opportunity to object at sentencing hearing,
a motion for new trial preserves error).

          Here,
Beatty and the trial judge both signed the conditions of community supervision
and Beatty’s fingerprint appears on the document.  Beatty did not object to this condition.  About a month later, Beatty filed a written
objection, contending that this condition violates Apprendi and Blakely, but
nothing in the record indicates that Beatty lacked an opportunity to object at
the time the trial court imposed the community supervision conditions and he
signed the order.  We therefore hold that
Beatty’s written objection, filed after the trial court imposed the community
supervision conditions, fails to preserve Beatty’s contention for appellate
review.

Conclusion

          We
hold that the State presented legally sufficient evidence that (1) Beatty
unlawfully appropriated between $20,000 and $100,000 of SCA’s property with the
intent to deprive SCA of that property and (2) Beatty and Cruse agreed to
commit theft from SCA.  Therefore, the
trial court correctly denied Beatty’s motion for an instructed verdict and
included a written jury instruction on conspiracy.  We further hold that, because Beatty did not
object to the terms of community supervision at the time the trial court imposed
the conditions, his Apprendi and Blakely motion failed to preserve the
issue for appellate review.  We therefore
affirm.

 

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Justices Jennings, Hanks,
and Bland.

Do Not Publish.  Tex.
R. App. P. 47.2(b).